## WESTERN PAPER MAKERS' CHEMICAL CO. et al. v. UNITED STATES et al.

(District Court, W. D. Michigan, S. D. May 28, 1925.)

### No. 2017.

1. Commerce ☞95 — District Court cannot weigh testimony as to reasonableness of rates or wisdom of establishing them.

While an order of the Interstate Commerce Commission fixing rates is invalid, unless supported by evidence, District Court cannot weigh evidence of the reasonableness of rates or wisdom of establishing them; such subjects being finally committed to judgment and discretion of Commission, when acting within its powers.

2. Commerce ☞95 — Findings of Interstate Commerce Commission are by law prima facie true.

Findings of the Interstate Commerce Commission are made by law prima facie true.

3. Commerce ☞95 — Commission's finding of fact of reasonableness of a rate cannot be pronounced arbitrary, if supported by any competent evidence.

Finding of Interstate Commerce Commission of reasonableness of a rate cannot be pro-

nounced arbitrary or unreasonable, if there is any competent evidence in its support.

**4. Commerce ⬦95—Findings as to reasonableness of rail rates on rosin to Kalamazoo and Grand Rapids held supported by evidence.**

Findings of the Interstate Commerce Commission as to reasonableness of rail rates on rosin from points south of the Ohio river to Kalamazoo and Grand Rapids, Mich., *held* not unsupported by evidence.

**5. Commerce ⬦87—Testimony of reasonableness of "specifics" held competent on issue of reasonableness of through rate.**

On hearing before Interstate Commerce Commission to establish tariffs on certain naval stores, from points south of the Ohio river to Kalamazoo, Grand Rapids, and other points, testimony of reasonableness of "specifics" north of the river was competent, since, on issue of reasonableness, propriety of each factor was both competent and material, notwithstanding in proposed new tariff rate was published as through rate.

**6. Carriers ⬦28, 32(2)—Rates held not discriminatory or violative of "long and short haul" clause of Interstate Commerce Act.**

Rail rates established by Interstate Commerce Commission on rosin from points south of the Ohio river to Kalamazoo and Grand Rapids, Mich., *held* not unjustly discriminatory as against such cities, or violative of the "long and short haul" clause of Interstate Commerce Act, § 4, as amended by Act Feb. 28, 1920, § 406 (Comp. St. Ann. Supp. 1923, § 8566), though rate from Gulf points was higher to Kalamazoo than to Chicago, and higher to Grand Rapids than to Milwaukee.

In Equity. Suit for injunction by the Western Paper Makers' Chemical Company and another against the United States and the Interstate Commerce Commission. Injunction denied.

Harry C. Howard, of Kalamazoo, Mich., for complainants.

E. M. Reidy, of Washington, D. C. (P. J. Farrell, of Washington, D. C., on the brief), for Interstate Commerce Commission.

Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C. (E. J. Bowman, Dist. Atty., of Grand Rapids, Mich., on the brief), for the United States.

Before DENISON and KNAPPEN, Circuit Judges, and SESSIONS, District Judge.

PER CURIAM. Hearing on motion for interlocutory injunction in a suit to modify an order of the Interstate Commerce Commission, establishing tariffs on certain naval stores so far as they relate to rail rates on rosin from points south of the Ohio river to the cities of Kalamazoo and Grand Rapids, Mich. Both plaintiffs are

Michigan corporations; the Paper Company doing business at Kalamazoo and the Tanglefoot Company at Grand Rapids, both being in central territory. Each plaintiff receives annually by freight large quantities of rosin shipped to it at its place of business above stated from points of origin in certain Southern states. This hearing was had before three judges under the Act of October 22, 1913, c. 32 (38 Stat. 220 [Comp. St. § 998]).

It appears from the Commission's report, without challenge, that practically the entire production of naval stores in the United States is in Florida, Georgia, Louisiana, Mississippi, Texas, and the Carolinas; the first three states named being the heaviest producers, and relatively as to each other in the order above given. The largest production is at the interior points, from which shipments are made by rail to South Atlantic and Gulf ports, where they are concentrated and crated and shipped by water or rail to destination. Savannah and Jacksonville are the principal South Atlantic ports, and Pensacola, Mobile, and Gulfport the principal Gulf ports, between which and the South Atlantic ports competition has become very keen.[1]

The Commission's order here attacked was made as the result of a suspension proceeding ordered by the Commission because of protests by producers and dealers in and shippers of naval stores, including plaintiffs, against a proposed comprehensive revision by carriers, in both the Southeastern and Mississippi Valley territory, of the rates on naval stores from all points of production. By the then prevailing tariffs, the rates from all South Atlantic ports to a given destination were the same, regardless of specific origin; some through rates being published to certain points in certain territory, made up of the local rate to the Ohio river plus a "specific" published by the line north of the river. A "specific," as stated by the Commission, is "said to be neither a local rate nor a division of a through rate, but in the nature of a proportional." 87 Interst. Com. Com'n R. 742. From some producing points in Southeastern territory the rates to destination points were affected by certain locals. Rates from the Gulf ports had always been lower than from interior producing points in the Mississippi Valley.

---

[1] Broadly speaking, the territory east of the line of the Louisville & Nashville Railroad, from Decatur, Ala., to Pensacola, Fla., is called Southeastern territory, and west of that line, Mississippi Valley.

Because of competition between South Atlantic and Gulf ports, there was some relation between rates from all the ports, and at the time of the proposed revision the rates from all the ports to Cincinnati were the same. The rates from New Orleans to Chicago had been influenced by the single line rates of the Illinois Central, and were lower than to other points in Central territory.

By these tariffs the rate on rosin to Cincinnati was 27 cents per 100 pounds; to Chicago, 39 cents from South Atlantic and 30 cents from Gulf ports; to Detroit, 39.5 cents from South Atlantic and 33 cents from Gulf; to Louisville, 27 cents from South Atlantic and 24.5 from Gulf; to Milwaukee, 44.5 cents from South Atlantic and 33 cents from Gulf; to Kalamazoo, 39 cents from South Atlantic and 34.5 from Gulf; to Grand Rapids, 44.5 from South Atlantic and 34.5 from Gulf. Chicago's rate from the Gulf ports was thereby 9 cents, Milwaukee's 1.5 cents, Detroit's 6.5 cents, Kalamazoo's 4.5 cents, and Grand Rapids' 10 cents lower than from South Atlantic ports.

By the proposed revision it was sought to equalize rates from all producing territory to Cincinnati, by increasing rates from the ports; the rates from the greater part of the territory being blanketed. To other river crossings the proposed rates were either the same as, or differentials over or under, the rates to Cincinnati. For example, the Cincinnati rate, while still the same from all ports, both Gulf and South Atlantic, was to be increased from 27 cents to 33 cents. To points beyond the Ohio river, new and higher specifics, furnished by lines operating beyond the river, were to be added. Chicago, Milwaukee, and other related points, however, were given by certain carriers[2] lower rates than proposed for Ohio river combinations, on the ground that single line rates of the Illinois Central from New Orleans required the Southeastern lines to establish lower rates to Chicago in order to meet the Illinois Central competition. To illustrate: The rate to Chicago from South Atlantic ports was proposed to be increased to 41 cents from the then existing rate of 39 cents, and from the Gulf ports to 37 cents from the then existing rate of 30 cents. The rate to Milwaukee from Gulf ports increased

from 33 cents to 40 cents, while from South Atlantic ports it decreased from 44.5 cents to 44 cents. The rates to Kalamazoo and Detroit were increased to 47.5 cents, and to Grand Rapids 48 cents, from both South Atlantic and Gulf ports.

Upon full hearing, to which both plaintiffs were parties, the Commission found the proposed new rates not justified, ordered a cancellation of the suspended schedules, and found the following to be just and reasonable rates for the future from South Atlantic and Gulf ports, respectively:[3] Cincinnati, 33 cents, both routes; Chicago, 40 cents and 37 cents; Milwaukee, 41 cents and 38 cents; Kalamazoo, 40 cents and 39 cents; Grand Rapids, 41 cents and 40 cents; Detroit, 40 cents by both routes. 37 Interst. Com. Com'n R. 754. The rate to Milwaukee was later made 42 cents and 39 cents, thus making the South Atlantic rate to Kalamazoo the same as to Chicago and Detroit, and the rate to Grand Rapids 1 cent less than to Milwaukee, and from the Gulf the rate to Milwaukee 2 cents higher than to Chicago, and to Grand Rapids 1 cent higher than to Milwaukee. 89 Interst. Com. Com'n R. 637; 91 Interst. Com. Com'n R. 226. It is these rates to Kalamazoo and Grand Rapids, so found by the Commission to be just and reasonable, which the bill before us seeks to set aside.

Plaintiffs' main contention, broadly stated, is that there was no evidence before the Commission supporting the rates to these two cities as so finally fixed.

[1] Recognizing the fundamental rule that an order of the Commission fixing rates is invalid, unless supported by evidence (Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U. S. 88, 91, 33 S. Ct. 185, 57 L. Ed. 431; New England Divisions Case, 261 U. S. 184, 203, 204, 43 S. Ct. 270, 67 L. Ed. 605, and cases there cited), this court cannot weigh the testimony as to the reasonableness of the rates or the wisdom of establishing them. Those subjects are finally committed to the judgment and discretion of the Commission, when acting within its power. Procter & Gamble v. United States, 225 U. S. 282, 297, 298, 32 S. Ct. 761, 56 L. Ed. 1091; Manufacturers' Ry. Co. v. United States, 246 U. S. 457, 481, 38 S. Ct. 383, 62 L. Ed. 831; Seaboard

---

[2] These carriers were Chicago & Alton, Chicago & Eastern Illinois, Chicago, Burlington & Quincy, Chicago, Indianapolis & Louisville, Illinois Central, Louisville & Nashville, and Southern. Rates by other carriers were the full combination of local rates to Cincinnati and specifics beyond. 87 Interst. Com. Com'n R. 746.

[3] The first rate stated is South Atlantic. We find it unnecessary to set out the rates to other points than given in this opinion, or to cover rates on turpentine, which, although involved in the Commission's hearing, are not in issue here.

Air Line Ry. Co. v. United States, 254 U. S. 57, 62, 41 S. Ct. 24, 65 L. Ed. 129.

[2] We do not understand plaintiffs to deny that the subject-matter was within the Commission's jurisdiction and power. Its findings are made by the law prima facie true, and the Supreme Court has ascribed to them "the strength due to the judgments of a tribunal appointed by law and informed by experience." Illinois Central R. Co. v. Interstate Commerce Commission, 206 U. S. 441, 454, 27 S. Ct. 700, 51 L. Ed. 1128; Interstate Commerce Commission v. Chicago, Rock Island & Pacific Ry., 218 U. S. 88, 110, 30 S. Ct. 651, 54 L. Ed. 946; Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U. S. 541, 546, 32 S. Ct. 108, 56 L. Ed. 308.

[3] A finding of the fact of reasonableness of a rate can thus not be pronounced arbitrary or unreasonable, if there was competent evidence in its support. In the view we take of the case, we find it unnecessary to decide whether the rule that the burden of proof is upon the carrier to show the reasonableness of its proposed increase in rates (Interstate Commerce Act, § 15, subd. 7, as amended by Act Feb. 28, 1920, § 418 [Comp. St. Ann. Supp. 1923, § 8583, subd. 7]) applies to rates prescribed by the Commission after a hearing upon the proposed increases. See section 15a, subd. 2, of the Act as added by Act Feb. 28, 1920, § 422 (Comp. St. Ann. Supp. 1923, § 8583a, subd. 2).[4] The entire record before the Commission is in evidence here.

[4] Plaintiffs concede that on the hearing before the Commission the lines south of the Cincinnati gateway offered evidence tending to show the reasonableness of that portion of the through rate from the points of origin to the river. The testimony so introduced related to both South Atlantic and Gulf port rates. The Cincinnati rate therein concerned is the same that the Commission found reasonable, viz. 33 cents. The substantial criticism thus necessarily is that there was no testimony sustaining the specifics north of the river, or of the rate as a through rate. But, while we are cited to no direct testimony of the reasonableness of any one through rate or specific, there was testimony tending to show that the suspended rates from Ohio river crossings north, on the basis of rates south of the river as factors, were reason-

able. See 87 Interst. Com. Com'n R. 747. And we think that for this and other reasons there cannot be said to be an absence of competent evidence thereof. It affirmatively appears that the specifics with which we are concerned north of the river are substantially less than the "specifics" or proportionals in actual use for a substantial period prior to the proposed revision which was the subject of the suspension proceeding. For example: Kalamazoo's old South Atlantic rate of 39 cents was 12 cents above the then river rate of 29 cents. By the 40-cent Southeastern rate to Kalamazoo, which the Commission adopted, the specific is but 7 cents above the new river rate. By the old Gulf schedules Kalamazoo's rate of 34.5 cents was 4.5 cents above Chicago and 7.5 cents above Cincinnati, while her new rate of 39 cents is but 2 cents above Chicago and 6 cents above Cincinnati. Grand Rapids' old South Atlantic rate of 44.5 cents was 17.5 cents above the river rate, while her new rate is but 8 cents above the river rate. Her old Gulf rate of 34.5 cents was 4.5 cents above Chicago and 7.5 cents above Cincinnati, while her new Gulf rate is but 3 cents above Chicago and 7 cents above Cincinnati. The increases of Kalamazoo's rates by both routes and of Grand Rapids' Gulf rate were thus not only due entirely to the increases of rates to the river and (apparently) to Chicago especially, but represented an actual decrease of specifics. As has already appeared, Grand Rapids' South Atlantic rate is 3.5 cents less than her old rate, while Kalamazoo's South Atlantic rate is but 1 cent higher than her old.

[5] Again, prior to the publication of the suspended tariffs, rates from the Southeast to various destination territories were published on the "sectional plan"; the factors to and from the river crossings being named in the tariffs. For example: The tariff from Jacksonville to Kalamazoo was shown as 27 cents to Cincinnati and 12 cents beyond. From the Gulf ports to Kalamazoo the rate was 34.5 cents. As the rate to Cincinnati was given as 27 cents, there was left 7.5 cents for the haul from Cincinnati to Kalamazoo. Each of these old specifics was thus substantially larger than the specific under the rates here under attack. We think it clear that the long-continued existence of established rates, made up of a key rate to the river (or to Chicago), and which came into the instant case through an effort by the carriers to establish higher rates, was at least some evidence of the reasonableness of the new specifics contained in the rates adopted

---

[4] "The Commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable, and to prescribe different rates for different [sec]tions of the country."

by the Commission. We see no merit in the suggestion that the testimony of the reasonableness of the "specifics" was incompetent. Upon the issue of reasonableness, the propriety of each factor was both competent and material, notwithstanding in the proposed new tariff the rate was published as a through rate. What we have said about the specifics or proportionals north of the river applies equally to both South Atlantic and Gulf rates, so far as through rates were based thereon. Further, the Commission had before it, not only comparative distances from representative points of shipment in both South Atlantic and Gulf territory to destinations, including Kalamazoo, Grand Rapids, and such comparable points as Cincinnati, Chicago, Milwaukee, and Detroit, but tables showing ton-mile earnings and car-mile earnings from representative points of shipment, in both Gulf and South Atlantic territory, under both the old and the suspended tariffs, by the shortest workable routes to each of the destinations given immediately above.[5]

[6] We think the rates here assailed must be sustained, unless unjustly discriminatory as against Kalamazoo and Grand Rapids, or both, or unless violative of the "long and short haul" clause (section 4) of the act (as amended by Act Feb. 28, 1920, § 406 [Comp. St. Ann. Supp. 1923, § 8566]). By plaintiffs' brief in this court the charge of discrimination is, at best, faintly presented. The bill alleges generally that rates from the Gulf ports to Kalamazoo are higher than from the same point of origin to Chicago, although the latter is the longer haul; that the rates from Mississippi Valley territory to Grand Rapids are higher than the rates from the same points of origin to Milwaukee, "which is a longer haul," and, more specifically, that the rate to Cincinnati was described by the carriers at the suspension hearing to be the key rate to the territory beyond; that the distance from Cincinnati to Kalamazoo is less than to either Chicago or Milwaukee, and from Cincinnati to Grand Rapids less than to Milwaukee; that transportation conditions to Kalamazoo and Grand Rapids were not shown to be less favorable than to Chicago and Milwaukee, and thus that Kalamazoo is directly intermediate to Chicago and Milwaukee, and Grand Rapids directly intermediate to Milwaukee by way of various worked and workable routes.

It will be observed that no charge of discrimination in South Atlantic rates is made.[6] Indeed, that rate to Kalamazoo is the same as to Chicago and Detroit, and 2 cents less than to Milwaukee, and to Grand Rapids is 1 cent less than to Milwaukee. From the Gulf territory, however, Kalamazoo's rate is the same as Milwaukee's, viz. 1 cent less than Detroit's, but 2 cents higher than Chicago's; and Grand Rapids' rate is 1 cent higher than Milwaukee's. But the direct and logical route from Cincinnati to Kalamazoo and Grand Rapids does not pass through either Chicago, Milwaukee, or Detroit. Nor does the direct and logical route from Chicago to Milwaukee pass through either Kalamazoo or Grand Rapids. Moreover, by one of the comparative earning schedules before referred to, the distance from Mobile[7] to the points involved here were to Cincinnati, 750 miles; Chicago (which is nearly 300 miles from Cincinnati), 858 miles; Milwaukee, 943 miles; Kalamazoo, 963 miles; Grand Rapids, 1,011 miles, and Detroit 1,021 miles. The Commission found that "because of the absence of routing instructions, Kalamazoo and Grand Rapids are technically intermediate to Chicago, Detroit, and Milwaukee by possible routes, although the record indicates that actual movement over such routes would be unusual." 91 Interst. Com. Com'n R. 225.

The Commission further found that the Illinois Central controls the rates from New Orleans to Chicago, and hence to Milwaukee, and that other carriers serving New Orleans and the other Gulf ports meet the New Orleans-Chicago rate so made. 91 Interst. Com. Com'n R, 226. We think that neither these findings nor the basing of the Mississippi Valley rate to Milwaukee upon the Chicago rate can be pronounced arbitrary or beyond the Commission's authority. It seems clear

---

[5] See Commission's report in suit by plaintiffs against Director General. 91 Interst. Com. Com'n R. 224, 225.

[6] Unless possibly as between Grand Rapids and Chicago. But, apart from the influence of the lower Gulf rates to Chicago, it is a mistake to say that the distance from Cincinnati to Grand Rapids is less than to Chicago. We are cited to no reference, and we know of none, supporting the statement in plaintiffs' brief that the Commission finds that "there is no justification for the through rate to Grand Rapids, which is higher than the rate to Chicago," if intended to refer to the new rate established by the Commission. Its findings are to the contrary. 87 Interst. Com. Com'n R. at page 754; 91 Interst. Com. Com'n R. at page 227.

[7] Mobile would seem to me a fairly representative Gulf port. The Commission says that "distances are stated by the parties to have been computed by the shortest workabl routes." 91 Interst. Com. Com'n R. 225.

that by neither the old nor the later suspended Gulf port tariffs was the rate to Cincinnati regarded as the key rate for Chicago and Milwaukee. The charge of discrimination, therefore, cannot be sustained. Seaboard Air Line Ry. v. United States, 254 U. S. 57–62, 41 S. Ct. 24, 65 L. Ed. 129.[8]

We see no basis for the contention that the rates established by the Commission violate the fourth section of the act. The Commission found that the suspended rates did have that effect, and in canceling those rates and ordering new rates denied applications for relief from fourth-section departures, with leave later to apply for relief where ground should exist therefor (87 Interst. Com. Com'n R. 756), and in modifying the rate from Milwaukee as before referred to, by reason of a charge of discrimination as against Kalamazoo and Grand Rapids, permitted, without requiring, the carriers to keep open routes from points in the eastern portion of the New Orleans group through Grand Rapids to Milwaukee by reducing the Grand Rapids rates from such points (89 Interst. Com. Com'n R. 637); and in its later order dismissing plaintiffs' complaint, which asked injunction against the rate adjustment (91 Interst. Com. Com'n R. 226–227), the Commission said, not only that "the new adjustment will result generally in the removal of the existing fourth-section departures in the origin territory," but "it is understood that the routing under the new adjustment will be so restricted as to remove the technical fourth-section departures with respect to destination points hereinbefore referred to," which were Chicago, Milwaukee, Kalamazoo, and Grand Rapids.

It results that the application for injunction must be denied. At the hearing counsel for both parties orally expressed willingness that the final decree be made upon the record already submitted and the arguments made upon the motion. Should counsel still be so minded, they may file stipulation to that effect.

---

[8] By the old established Gulf port tariffs, rates to Cincinnati, Chicago, and Milwaukee were, in the order above given, 27 cents, 30 cents, and 33 cents; by the suspended rates they were, respectively, 33 cents, 37 cents, and 40 cents; while Kalamazoo's rate was 34.5 and 47.5. The rates from South Atlantic ports to the Louisville and Cairo river crossings, adopted by the Commission, were the same as to Cincinnati, viz. 33 cents; while the Gulf rates were, in the case of Louisville 1 cent, and in the case of Cairo 5 cents, less than to Cincinnati, apparently due to the influence of the Illinois Central rates from New Orleans. 87 Interst. Com. Com'n R. 754.