STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION v. NELLO L. TEER COMPANY.

(Filed 4 February, 1966.)

**1. Utilities Commission § 7—**

A shipper complaining of unjust discrimination in rates has the burden of proving the facts essential to its right to relief. G.S. 62-75.

**2. Utilities Commission § 9—**

Rates of the Utilities Commission are *prima facie* just and reasonable and will be upheld on appeal when a review of the whole record fails to disclose prejudicial error and the order of the Commission is supported by findings supported by competent evidence. G.S. 62-94(c)(e), G.S. 62-132.

**3. Utilities Commission § 6—**

The statutory requirement that the Utilities Commission prevent discrimination in rates and services does not require an equality of rates where shipments are from different points of origin to the same destinations, even though the distances be equal or approximately so, since the Commission must take into consideration in addition to distance other factors which furnish a distinction between customers, such as quantity, time, manner of service, cost of service, and competition from other forms of transportation.

**4. Same; Carriers § 5— Evidence held to support conclusion that differentiation in rates was not unreasonable.**

Complainant objected that it was charged a "joint-line" rate for shipments from its plant to market destinations over a connecting carrier, while its competitor, shipping from a point approximately equidistant to the same destinations, was charged the lesser "single-line" rate, notwithstanding the shipment had to be handled by two carriers. The evidence

disclosed that complainant's shipments, because of the distance to the interchange point of its connecting carrier, had to be handled in the regular manner for interchange shipments, which involved increased costs, while its competitor's plant was so near the interchange track of its connecting carrier that its loaded cars were pulled by a yard engine to the interchange point, which entailed nothing more than would be required had the entire shipment been over a single line, and further that there was active barge competition at the point of its competitor's plant, but not at its own. *Held:* There was ample competent evidence to support the finding by the Commission that the rate differential was reasonable, and therefore the Commission was not compelled by statute to order it abolished.

APPEAL by Nello L. Teer Company from *Carr, J.,* February 1965 Non-Jury Session of WAKE.

In its amended complaint, filed before the North Carolina Utilities Commission, the appellant, hereinafter called Teer, complains of Norfolk-Southern Railway Company, the Atlantic and East Carolina Railway Company, Southern Railway Company, original defendants, and the Atlantic Coast Line Railroad Company, additional defendant, alleging unreasonable discrimination against it in the matter of railroad freight rates. The Superior Stone Company and the North Carolina State Highway Commission intervened in opposition to the complaint. After a hearing, the Commission entered an order denying the relief sought, from which order Teer appealed to the Superior Court of Wake County. From a judgment of the superior court overruling each of Teer's exceptions, and affirming the order of the Commission, Teer now appeals.

The complaint alleges in essence: Teer produces crushed stone, called aggregates, at Rocky Mount and ships them from there to Elizabeth City and other points on the Norfolk-Southern in northeastern North Carolina. These shipments move by rail over the tracks of the Coast Line to Plymouth and thence over the tracks of the Norfolk-Southern to the points of destination. For such transportation, Teer pays a "joint-line" rate, in accordance with rate tariffs heretofore filed with and approved by the Commission. Its competitor, Superior Stone, ships similar materials from Oaks, North Carolina, near New Bern, to the same destinations, these shipments moving by rail over the tracks of the Atlantic and East Carolina Railway to New Bern and thence over the Norfolk-Southern. The total distances are substantially the same, Rocky Mount being slightly nearer to the destinations than Oaks. Pursuant to tariffs heretofore filed and approved by the Commission, Teer's competitor pays a "single-line" rate. The "single-line" rate is 10 cents per ton less than the "joint-line" rate. Southern Railway is the operator of the Atlantic and East Carolina Railway. Alleging that this discrepancy between the rate charged it and the rate charged its competitor

is unjust, unreasonable and unfairly discriminatory against it, Teer prayed the Commission, in the alternative, to enter an order directing the Southern, Atlantic and East Carolina, and Norfolk-Southern to delete from their tariffs the provision for "single-line" rates on traffic moving between stations on the Atlantic and East Carolina and stations on the Norfolk-Southern, or to enter an order directing the Coast Line and the Norfolk-Southern to make provisions in their tariff for a "single-line" rate to apply from Rocky Mount to destinations on the Norfolk-Southern between Plymouth and the Virginia State line.

The Norfolk-Southern filed no answer and does not resist the complaint in either alternative of the prayer for relief. The Southern and the Atlantic and East Carolina filed a joint answer denying that the "single-line" rate between the Atlantic and East Carolina and the Norfolk-Southern is an unreasonable discrimination against Teer, or that it is otherwise unlawful. They pray that the complaint be dismissed. The Coast Line filed an answer alleging that the differential between "single-line" rates and "joint-line" rates is reasonable, that the service rendered by it and the Norfolk-Southern to Teer is "joint-line" service so that the "joint-line" rate properly applies to it. The Coast Line alleges that to compel it and the Norfolk-Southern to perform this service for the "single-line" rate would force them to render the service at a rate which is non-compensatory, unreasonable and violative of the statutes and Constitution of North Carolina. The Coast Line denies that the rate differential set forth in the complaint is unreasonable discrimination or otherwise unlawful and prays that the complaint be dismissed and that the "joint-line" rate be maintained.

It is not denied by any of the railroads that the "joint-line" rate is charged Teer by the Coast Line and the Norfolk-Southern for shipments from Rocky Mount and that the "single-line" rate is charged its competitor by the Atlantic and East Carolina and the Norfolk-Southern for shipments from Oaks to the same destinations northeast of Plymouth. It is likewise undisputed that, as a result, on shipments of aggregates to Elizabeth City, Teer pays $1.60 per ton whereas Superior Stone, shipping from Oaks, pays $1.50 per ton. Norfolk-Southern is the delivering carrier in all shipments to the points in question northeast of Plymouth.

The plaintiff offered evidence tending to show:

Its stone and that of its competitor can be used for the same purposes. The Teer quarry at Rocky Mount is the only potential competitor of the quarry of Superior Stone at Oaks for the markets in question. Shipments by rail from Oaks must originate on the Atlantic and East Carolina Railroad. It interchanges shipments con-

signed to points on the Norfolk-Southern with the Norfolk-Southern at New Bern, 3.4 miles east of Oaks. Shipments by rail to such points, originating at Teer's quarry at Rocky Mount, move by the Coast Line to Plymouth where they are interchanged with the Norfolk-Southern. The total charge of $1.50 per ton on the shipments from Oaks to Elizabeth City is divided between the railroads so the Atlantic and East Carolina receives 39 cents for carrying the shipments 3.4 miles, and the Norfolk-Southern receives $1.11 for carrying the shipments 114.1 miles. Many years ago the Norfolk-Southern operated what is now the line of the Atlantic and East Carolina. At present the two railroads are entirely separate. The rate advantage enjoyed by Superior Stone by reason of this differential puts Teer at a disadvantage in its efforts to compete for the markets northeast of Plymouth. In former years, Teer also operated a quarry at Oaks and on shipments from it to the destinations now in question it was charged the "single-line" rate.

The Southern controls the Atlantic and East Carolina. These two carriers offered evidence tending to show:

At Oaks, which is on the Atlantic and East Carolina, the railroad competes with barge transportation. This caused the Atlantic and East Carolina and the Norfolk-Southern to institute a special low rate on multiple car lots of crushed stone to Plymouth, Elizabeth City and intermediate points, which are the destinations in question. This multiple car rate is a matter separate and apart from the "single line" rate attacked in this proceeding by Teer, and is not attacked by Teer in this proceeding. Superior Stone uses the same conveyor belts to load barges at Oaks that it uses to load railroad cars there. Barges, so loaded, can move the stone from Oaks to Plymouth, Elizabeth City and Mackeys. There is no such barge competition for the movement of aggregates at any other place in the State. The multiple car rate designed to meet this barge competition applies to movements of aggregates from Oaks to Norfolk-Southern stations northeast of Plymouth. The multiple car rates so applicable would remain in effect whether or not the "single line" rate continues.

The Southern and the Atlantic and East Carolina oppose the abolition of the "single line" rates from Oaks. They do not oppose the establishment of such a rate by the Coast Line and the Norfolk-Southern for shipments from Rocky Mount.

The movement of the cars from Oaks to New Bern is a yard switch engine operation. The yard engine pulls the cars from the quarry at Oaks to the yard where they are weighed and placed on the interchange track, from which they are picked up by the Norfolk-Southern train and carried to the destination. The two rail-

roads use the same yard at New Bern. As a consequence, the inter-change operation is a very simple one. The simplicity of the yard operation at New Bern results in a substantially lower cost of han-dling the shipments from Oaks to one of the Norfolk-Southern sta-tions beyond Plymouth than would be the case if each railroad at the interchange point had its own yard, in which latter event cars to be interchanged would have to be moved from the interchange track in the yard of the incoming carrier to the interchange track in the yard of the outgoing carrier.

The cost analysis study made by the Southern, assuming it to be correct, both in analysis and in computation, shows that the "single-line" rate is "highly compensatory" to both participating carriers. In this connection, the term "highly compensatory" means that the rate produces revenue substantially in excess of the out-of-pocket cost of handling the shipment.

The Coast Line offered evidence tending to show:

The differential between "single-line" and "joint-line" rates originated with an order by the predecessor of the Utilities Commis-sion, the Corporation Commission, in 1921. Since that time the dif-ferential has varied in amount but has always been maintained. With one exception, shipments moving over the Atlantic and East Carolina and the Norfolk-Southern are the only shipments actually moving over the tracks of more than one railroad to which a "single-line" rate is applied.

The Coast Line has no objection to the elimination of this ap-plication of the "single-line" rate, in which it has no participation. What it objects to is an order requiring it and the Norfolk-Southern to establish a "single-line" rate for the shipment of aggregates from Rocky Mount to points on the Norfolk-Southern beyond Plymouth. There are many points on the Coast Line, other than Rocky Mount, at which road aggregates are produced. If the "single-line" rate were made applicable to the shipments here in question, the Coast Line fears that they might ultimately have to be made applicable from other such production points on its system within the State. The differential between "single-line" and "joint-line" rates also applies to many commodities other than road aggregates.

The shipments from Rocky Mount, here in question, move 68 miles by the Coast Line to Plymouth. There they are interchanged with the Norfolk-Southern and move by that railroad to the final destination. To require the Coast Line and the Norfolk-Southern to put the "single-line" rate into effect on these shipments would de-prive the Coast Line of substantial revenues.

The Coast Line and the Norfolk-Southern are two entirely sep-arate railroads. The cost analysis made by the Coast Line, assum-

ing its correctness of analysis and computation, shows that the out-of-pocket cost per ton for a "joint-line" haul is 27 cents greater than such cost for a "single-line" haul, this additional cost increasing by a like amount for each additional railroad involved in the haul. This additional cost of the "joint-line" haul is due to the additional service required in interchanging (switching) the car from one railroad to another. This is the justification for the higher rate on the "joint-line" haul. The additional charge of 10 cents per ton is not sufficient to cover the additional out-of-pocket cost. If the "single-line" rate is made applicable to a "joint-line" haul, the participating railroad must absorb the additional cost of 27 cents per ton. It costs more to handle traffic in "joint-line" service than to handle such traffic in "single-line" service. This difference is 27.5 cents per ton where two railroads participate in the haul.

The State Highway Commission offered evidence tending to show that if the "single-line" rate were abolished on shipments from Oaks to Norfolk-Southern destinations (not necessarily those involved in the Teer complaint) there would be some diversion of the traffic from the railroads to truck transportation.

The Superior Stone Company introduced evidence tending to show that if the "single-line" rate from Oaks to Norfolk-Southern destinations were changed to a "joint-line" rate there would be a diversion of traffic from the railroads to trucks and to barges.

The Commission made eighteen numbered findings of fact of which only the following need to be set forth here:

"12. The operations performed in moving road aggregates from Oaks to destinations on Norfolk-Southern when transferred to the latter at New Bern are unlike operations in moving similar commodities from Rocky Mount to the same destinations when interchanged with Norfolk-Southern at Plymouth. Operations between Oaks and New Bern, the interchange point with Norfolk-Southern, a distance of 3.4 miles, are performed as a yard switching service by New Bern yard personnel. No train or line-haul movement between Oaks and New Bern is involved. The road aggregates from Rocky Mount to Plymouth, the point of interchange with Norfolk-Southern, a distance of 68 miles, move in train or line-haul service. The operations between Oaks and the interchange tracks with Norfolk-Southern through a jointly operated station and yard is not as costly as one requiring a train movement in addition to switching through yards not maintained and operated jointly by connecting carriers.

"13. Out-of-pocket costs of transporting road aggregates in gondola cars, average weight 119,100 pounds, from Oaks to Mackeys and Elizabeth City are $52.00 and $65.81 per car, respectively. The revenues under single-line rates of $74.44 and $89.33 per car, respectively, exceed the out-of-pocket costs by $22.44 and $23.52 per car. The out-of-pocket costs of transporting road aggregates in gondola cars of 55 tons' capacity, based on a formula applicable generally to the entire Southern Region of the United States for distances of 78 and 116 miles over two carriers, being the equivalent of the distances from Rocky Mount to Mackeys and Elizabeth City over Coast Line and Norfolk-Southern, are 162 cents and 184 cents a net ton. These out-of-pocket costs are 27 cents and 24 cents, respectively, in excess of the mileage commodity scale rates of 135 cents and 160 cents a ton.

\*          \*          \*          \*

"18. Single-line rates between A&EC stations and Norfolk-Southern stations and their predecessors have applied since the two railroads connected shortly after the turn of the century and have continued, subject only to adjustments or revisions to reflect changed conditions, without unjust discrimination or undue preference or advantage. The differential of 10 cents a ton in the single-line rates under the joint-line rates applicable from Rocky Mount is not unduly preferential of Superior Stone Company at Oaks, nor is it unduly prejudicial to Complainant."

The Commission thereupon concluded that the complaint should be dismissed and it so ordered. The superior court overruled all exceptions by Teer to the order of the Commission.

*Nancy Fields Fadum for appellant.*
*Attorney General Bruton and Assistant Attorney General Barham for North Carolina State Highway Commission.*
*Edward B. Hipp for North Carolina Utilities Commission.*
*Norman C. Shepard and Charles B. Evans for Atlantic Coast Line Railroad Company.*
*Joyner & Howison for Atlantic & East Carolina Railway Company.*
*Maupin, Taylor & Ellis for Intervener, Superior Stone Company, Division of Martin Marietta Corporation.*

LAKE, J. This proceeding was instituted before the Utilities Commission by the filing of a complaint by Teer. Consequently, the statute imposes upon Teer the burden of proving the facts essential

N.C.] FALL TERM, 1965. 373

to its right to relief from the rate relationship of which it complains. G.S. 62-75. Since the cost data and other circumstances concerning justification for the differential in rates of which Teer complains are more readily available to the participating railroads than they are to a complaining shipper, it may well be thought that in such proceedings as these, just as in proceedings instituted by the Utilities Commission, the burden should be placed upon the carriers to prove the reasonableness of the rate relationship. However, the Legislature has clearly provided to the contrary.

In its brief Teer says:

"Appellant does *not* contend that the Uniform Mileage Commodity Scale on aggregates which provides for the application of single-line rates to single-line hauls and the application of joint-line rates to joint-line hauls, and which has been in effect since 1921 for application over all railroads in the State of North Carolina, is *per se* unreasonable or discriminatory. Appellant emphatically insists, however, that it is unreasonable and discriminatory to label a joint-line haul as a single-line haul and apply a single-line rate to such a haul while at the same time describing a similar haul as a joint-line haul and applying a joint-line rate to it. * * * Again it should be kept in mind that we are not discussing the reasonableness of the joint-line or single-line rates *per se*."

It is further provided by the statute that rates established by the Commission shall be deemed just and reasonable. G.S. 62-132. Again, the statute with reference to appeals from the Commission provides: "Upon any appeal, the rates fixed, or any rule, regulation, finding, determination, or order made by the Commission under the provisions of this chapter shall be *prima facie* just and reasonable." G.S. 62-94(e). In the consideration of such appeal the court is required to review the whole record, or such portions thereof. as may be cited and "due account shall be taken of the rule of prejudicial error." G.S. 62-94(c).

G.S. 62-140 provides:

"(a) No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service. The Commission may determine any questions of fact arising under this section.

"(b) The Commission shall make reasonable and just rules and regulations:

"(1) To prevent discrimination in the rates or services of public utilities. * * *"

The first paragraph of this statute is similar to Section 3 of the Interstate Commerce Act. It does not require an equality of rates where the shipments are from different points of origin to the same destination even though the distances be equal or approximately so. As Higgins, J. said, in *Utilities Commission v. Motor Carriers Asso.*, 253 N.C. 432, 440, 117 S.E. 2d 271:

"[R]ate-making involves more than mileage. * * * There are factors involved in rate-making which justify lower per-mile rates from some points than from others. * * * The law does not contemplate that all rates shall be equal for like dis- ·tances. Room is left for a rate structure which takes all factors of rate-making into account."

While that case involved motor carriers, the rule as to railroad rates is the same in those respects.

It is not necessary for us to determine upon this appeal, and we do not pass upon, the question of the authority of the Utilities Commission, by an appropriate order, to remove the existing rate differential between shipments from Oaks to points northeast to Plymouth and shipments from Rocky Mount to the same destination. It may well be that the authority of the Commission under G.S. 62-32 to fix and regulate "reasonable rates and charges" of public utilities is sufficient to permit it to eliminate rate differentials between localities which are not unreasonable so as to constitute a discrimination forbidden by G.S. 62-140. Nor do we find it necessary to decide whether the application of the "single-line" rate to shipments moving between other points on the Atlantic and East Carolina and the Norfolk-Southern is lawful. The question for decision on this appeal is whether the complainant has carried the burden, imposed upon it by the statute, of proving an "unreasonable difference" between the rates charged on shipments of aggregates from Oaks to points on the Norfolk-Southern and those charged Teer so as to make it the duty of the Commission to remove the differential.

Since we reach the conclusion that the complainant has not proved such "unreasonable difference," we do not reach the question of what the Commission might have required the Coast Line to do, if such difference had been proved. The complainant is served by the Coast Line in conjunction with the Norfolk-Southern. It does

not question the reasonableness of the rate charged to it *per se.* This rate is the "joint-line" rate, computed according to the scale approved by the Commission and in effect throughout the State, with few exceptions. The Coast Line had no participation in the establishment of the more favorable rate from Oaks and has no power to change that rate. It may well be doubted that any violation of G.S. 62-140(a) is established by the showing of even an "unreasonable difference" between rates upon shipments from different points of origin to a common destination when no carrier, or group of carriers, has a controlling power over both of the rates. See: *Texas & Pacific Ry. Co. v. United States,* 289 U.S. 627, 53 S. Ct. 768, decided under the original Section 3 of the Interstate Commerce Act. Compare, however, *New York v. United States,* 331 U.S. 284, 67 S. Ct. 1207, decided after Section 3 was amended. If such rate differential be a violation of G.S. 62-140(a), there would also arise the serious question as to whether the Commission, acting under paragraph (b) of that statute, could require a reduction of the rate from Rocky Mount in order to equalize the two rates, or would be limited to an order increasing the rate from Oaks. Since these questions are not necessary for the determination of this appeal, we do not now express any opinion as to either of them.

The Commission found: "The differential of 10 cents a ton in the single-line rates under the joint-line rates applicable from Rocky Mount is not unduly preferential of Superior Stone Company at Oaks, nor is it unduly prejudicial to Complainant." There is in the record "competent, material and substantial evidence" to support this finding.

The justification for the higher rate normally charged where the shipment moves over the lines of two railroads, as contrasted with a shipment moving over the line of but one, is that in the "joint-line" movement there is an additional switching movement which adds to the expense of rendering the service. Where the "joint-line" haul is handled under such circumstances that there is no such additional expense, there is no such justification for the higher rate. Certainly, in such case the charging of the "single-line" rate is not unreasonable.

This Court has said: "There must be substantial differences in service or conditions to justify difference in rates. There must be no unreasonable discrimination between those receiving the same kind and degree of service." *Utilities Commission v. Mead Corp.,* 238 N.C. 451, 462, 78 S.E. 2d 290; *Utilities Commission v. Municipal Corporations,* 243 N.C. 193, 203, 90 S.E. 2d 519. In the *Municipal Corporations* case, the Court quoted with approval *Brown v. Pa.*

*Public Utilities Comm.,* 152 Pa. Super. 58, 31 Atl. 2d 435, where is said, "The charging of different rates for service rendered under varying conditions and circumstances is not unlawful." It also quoted with approval *Ford v. Rio Grande Valley Gas Co.,* 141 Tex. Rep. 525, 174 S.W. 2d 479, saying, "Any matter which presents a substantial difference as a ground for distinction between customers, such as quantity used, time of use, or manner of service, is a material * * * factor." Thus, a substantial difference between the costs of rendering the two services justifies some difference in the rates, nothing else appearing.

The record shows that a car of aggregates moving from Oaks to one of the destination points in question is handled exactly as it would be if the track of the Norfolk-Southern extended to Oaks so as to make this, in fact, a shipment over a single line. The yard engine pulls the loaded car from the quarry at Oaks to the track scales in the New Bern yard, where the car is weighed, and from there pulls it to the interchange track, where it is picked up by the line-haul train of the Norfolk-Southern and carried to its destination without further switching. It must then, of course, be switched and "spotted" for unloading.

In the absence of any evidence to the contrary, the Commission was entitled to infer from competent evidence in the record that a switch engine pulled the loaded cars from the Teer quarry at Rocky Mount to track scales for weighing and thence to a track in the Coast Line yard, where the Coast Line-haul train picked it up and hauled it to Plymouth. That is, the procedure at Rocky Mount was the same as the procedure at Oaks-New Bern. At Plymouth, it would be necessary to set the car on an interchange track for pickup by the Norfolk-Southern. Assuming the simplest operation at Plymouth and a yard jointly operated by the Coast Line and the Norfolk-Southern, there would have to be at least one switching operation involving this car at Plymouth before it could pass on to the ultimate destination. At the ultimate destination, it would again have to be switched so as to "spot" the car for unloading just as would have to be done with a car coming from Oaks.

Thus, the record shows that in the haul from Rocky Mount to the ultimate destination there is, necessarily, at least one more switching movement than is involved in the shipment from Oaks to the same destination. There is also evidence in the record by a Coast Line witness that the differential of 10 cents per ton between "joint-line" and "single-line" rates is not sufficient to cover this additional cost. That being true, it is not unreasonable to charge a lower rate on the shipment from Oaks than on the shipment from Rocky Mount, nothing else appearing.

It is also shown by competent, substantial evidence in the record that at Oaks there is active competition between the railroad and barges for the hauling of this commodity to the destinations in question. There is no such competition at Rocky Mount, or at any other point in the State where this material is produced. To eliminate the existing rate differential, by charging the same rate from Oaks as is now charged from Rocky Mount, would not improve Teer's competitive position if the only effect were to divert this commodity to water transportation. The record contains competent, substantial evidence to show that this would be the result of such action. Competition with carriers by water at one point of origin and absence of such competition at the other is a material difference in circumstances which must be considered in passing upon the reasonableness of a differential in railroad rates.

In *East Tenn., V & G Ry. Co. v. Interstate Commerce Comm.*, 181 U.S. 1, 18, 21 S. Ct. 516, speaking of Section 3 of the Interstate Commerce Act, which is similar to G.S. 62-140, the Court said:

"The prohibition of the third section, when that section is considered in its proper relation, is directed against unjust discrimination or undue preference arising from the voluntary and wrongful act of the carriers complained of as having given undue preference, and does not relate to acts the result of conditions wholly beyond the control of such carriers. * * * The commission found that if the defendant carriers had not adjusted their rates to meet the competitive condition at Nashville, the only consequence would have been to deflect the traffic at the reduced rates over other lines."

Again, in *Barringer & Co. v. United States*, 319 U.S. 1, 7, 63 S. Ct. 967, with reference to Section 3, the Court said:

"It has long been established by our decisions that differences in competitive conditions may justify a relatively lower line-haul charge over one line than another, and that it is for the Commission, not the courts, to say whether those differences are sufficient to show that a difference in rates established to meet those conditions is not an unjust discrimination or otherwise unlawful."

There is, therefore, ample, competent evidence in the record to support the finding by the Commission that the rate differential between Oaks and Rocky Mount is not an "unreasonable difference." Consequently, the Commission is not compelled by the statute to order it abolished.

The plaintiff having failed to sustain the burden of proving a discrimination forbidden by G.S. 62-140, and there being in the record ample, competent evidence to support the ultimate finding of the Commission and its order, we do not deem it necessary to discuss in detail the appellant's assignments of error contending that the Commission admitted other evidence which was incompetent and took judicial notice of facts not set forth with the particularity required by G.S. 62-65(b). We have examined each of these assignments. If the Commission erred in these respects, such error was not prejudicial to the appellant so as to require a reversal of the order. There was, therefore, no error in the overruling by the superior court of the appellant's exceptions to the order of the Commission and its judgment is

Affirmed.